## UNIVERSAL CONSTRUCTION COMPANY et al., Appellants, v. CITY OF ST. LOUIS, Appellant.

Division Two, July 16, 1920.

1. **SEWER CONSTRUCTION: Commissioner's Estimates: Finality: Mistake: Fraud: Arbitrariness.** A clause in the contract between the construction company and the city that the sewer commissioner "shall determine the quantity and classification of the several kinds of work or material" and that "his estimates and decisions shall be final and conclusive" is one which the parties had a right to make, and is the law of the case; and in the absence of fraud, mistake, or such gross negligence or arbitrariness as amounts to fraud, no appeal lies from his decisions; and where there is. no charge of actual fraud, his decision can be impeached, where he had jurisdiction of the subject-matter, only for arbitrariness or mistake, and by mistake is meant a mistake in the facts and not in judgment.

2. ——: **Excavations: Macadam Material: Substantial Evidence.** In an action at law, properly referred, a modification and rejection by the trial court of a finding by the referee on a disputed question of fact, if supported by substantial evidence, are binding on the appellate court, where the appeal was taken before the Act of 1919 became effective. So that where the contract provided that Class A should "include detached pieces of rock or boulders one cubic yard or more in contents, all masses of solid, well defined ledges of stone, or masses of rock" and that Class B should "include all other materials encountered," and there is substantial evidence that the excavated substances did not come within Class A, not even as "masses of rock," but properly fell within Class B as "other material," a rejection by the trial court of the finding of the referee that the substances belonged to Class A, and a finding by the trial court that they came within Class B, cannot be reversed on appeal.

3. **REFERENCE: Weighing Evidence on Appeal: Act of 1919.** The Act of 1919 (Laws 1919, p. 213) requiring the Supreme Court to weigh the evidence in reference cases, was not retroactive, and does not apply to causes pending on appeal when the act became effective.

4. **SEWER CONSTRUCTION: Brick Masonry: Manholes: Thirteen Inches.** Where the contract provided that the brick masonry for the sewer "shall be measured in place and paid for by the yard" and did not specifically name the thickness of the walls, but a plat made a part of the contract indicated that the thickness at the manholes should be thirteen inches, an estimate of thirteen inches for the entire sewer, including the manholes, made by the commissioner and approved by the referee and trial court, and impeached only by unsatisfactory evidence, will not be disturbed on appeal, though the work about the manholes was to be somewhat more neatly and substantially done.

5. **———: Dry Mix Foundation: Extra Work.** Where the contract provided that the sewers should "be built upon the soil directly or upon a concrete foundation of the class specified in the plans or described in the specifications," and the commissioner allowed for the full amount of the concrete, a refusal of the trial court to allow the contractor, as for extra work, for "dry mix" foundation used to bring the bottom of the sewer in wet places to a uniform level, being supported by substantial evidence, will not be disturbed on appeal.

6. **———: Sewer Support: Allowed by Commissioner.** An item for heavy brick masonry constructed in a tunnel through ground of such character that it would not support the sewer, being a matter clearly confided to the decision of the commissioner by the contract, whether allowed by him in his final estimate in a lump sum, with similar work, or entirely rejected by him, cannot be further investigated.

7. **———: Jointing: Implied in Contract.** Where the contract provided that "all work not herein specified which may fairly be implied as included in the agreement, of which the sewer commissioner shall be the judge, shall be done by the contractor without extra charge," a rejection by the trial court of a charge for filling in mortar between joints in the brick wall, so as to bring the surface of the mortar even with the surface of the brick, claimed by the contractor as not covered by the contract, but ordered, though unnecessary, by the city, and disputed by the city as having been ordered, will not be disturbed on appeal, the evidence tending to show that such work was an incident of ordinary brick-work, and being otherwise of an unsatisfactory character.

8. ———: Rebinding Caved Portion. Where the contractor claimed that the caving-in of a portion of the sewer was due to defects inherent in the plan of construction adopted by the city, and the city claimed it was due in part to a too-hasty removal of the sheeting designed to hold back the ditch-walls until mortar in the sewer-walls had set, and in part to the use of frosty bricks in damp weather, and there was substantial evidence in support of both claims, the refusal of the trial court to allow the contractor compensation for rebuilding the caved portions will not be disturbed on appeal.

9. ———: Extra Depth. A charge that the engineers gave the contractor a grade for the construction of the sewer which was below the grade shown by the sewer profile, that the substance below the profile grade was quicksand and the expense of excavating it exceeded the stipulated price of $1.25 per cubic yard, being unsupported by substantial evidence and disallowed by the trial court, will not be sustained on appeal, where the sewer commissioner allowed plaintiff "the total excavation cost," whether the change in the grade was intentional or by mistake.

10. ———: Not Covered by Contract: Lumber Used in Tunnel. The contractor may be allowed for lumber left in a tunnel under railroad tracks, used to keep its roof from falling into the sewer, although no provision of the contract relates to it, where it was so left, if not at the express direction of the city, at least upon its intimation and suggestion.

11. INTEREST: Intervening Suits: Payment Into Court. Injunction suits by intervening sub-contractors and materialmen to enjoin the city from paying to the contractor the amount that should be found to be due him did not prevent the city from paying into court the amount admittedly due him, and consequently the court did not err in adjudging him interest from the time those amounts became due until they were paid.

12. COSTS: Apportionment. The plaintiff brought suit for $212,088, and the city filed a general denial, but at the hearing admitted liability in the sum of $99,000, of which amount $70,407.73 was paid before judgment, which was, principal and interest, for $22,152.40. After this admission the controversy related to thirteen claims, all of which except one for $282 were disallowed by the trial court, and are disallowed on appeal. The costs amount to several thousand dollars, and in the trial court the city filed a motion to have them taxed against plaintiff and defendant in the proportion that the amount sought to be recovered against defendant bore to the amount actually recovered. Both parties appealed from the judgment. Held, that, under Section 2266, Revised Statutes 1909, the motion should have been sustained.

Appeal from St. Louis City Circuit Court.—*Hon. William M. Kinsey*, Judge.

AFFIRMED (*in part*); REVERSED AND REMANDED (*in part, with directions*).

*Kinealy & Kinealy* for plaintiffs.

(1) Where the engineer or other person is, in construction contracts, made an arbitrator to decide certain matters of fact, his decision is not binding as to matters not within the terms of the submission, nor where his decision is arbitrary, fraudulent, or plainly erroneous, nor where he misconstrues or fails to follow the contract provisions. Lewis v. Ry. Co., 49 Fed. 708; Williams v. Ry., 112 Mo. 463, 153 Mo. 487; Scott v. Parkview R. & I. Co., 241 Mo. 112, 255 Mo. 76; Heman v. St. Louis, 213 Mo. 538; 30 Am. & Eng. Ency. Law (2 Ed.), p. 1271. (2) In constructions for municipalities, extra work must be paid for. Steffen v. St. Louis, 135 Mo. 44; Whitworth v. Webb City, 204 Mo. 579. (3) In construing a contract, all its words and provisions should be given effect, if possible. Kelerher v. Little, 203 Mo. 498; State ex inf. v. Burkhead, 187 Mo. 14. (4) The terms of a construction conract control contradictory provisions of the specifications, and the latter in turn control the plans. 30 Am. & Eng. Ency. Law (2 Ed.), p. 1201; Boteler v. Roy, 40 Mo. App. 234; Cruthers v. Donahoe, 85 Conn. 629; Meyer v. Berlandi, 53 Minn. 59. (5) A contractor is entitled to recover the loss or damage suffered by him through defects in the plans and specifications which are not discernible by ordinary diligence. 9 C. J. 735; Manufacturing Co. v. Heinz, 120 Mo. App. 465.

*Charles H. Daues* and *H. A. Hamilton* for respondent.

(1) This is an action at law involving the examination of a long account which was referred to a referee;

the findings of fact by the trial court, if supported by substantial evidence, are binding upon the appellate court. When the trial court on exceptions duly filed sets aside the findings of the referee and makes its own findings, the conclusions of fact made by the trial court are presumed to be correct, rather than those of the referee. St. Louis to use v. Parker-Washington Co., 271 Mo. 229; Roloson v. Riggs, 274 Mo. 522; Christine v. Luyties, 280 Mo. 416. (2) The decision of an engineer, authorized by the terms of a contract to make findings binding upon the parties to the contract, is not subject to attack or review, except for fraud or for error so palpable and gross that refusal to correct it amounts to fraud. Williams v. Railway, 112 Mo. 463; Williams v. Railway, 153 Mo. 487; McCormich v. St. Louis, 166 Mo. 315; City St. Imp. Co. v. Marysville, 23 L. R. A. (N. S.).32; Lewis v. Railroad, 49 Fed. 708. (3) When funds in the hands of a debtor are garnished interest cannot be allowed in favor of a creditor while the garnishment proceeding is pending. Cohen v. Ins. Co., 11 Mo. 374; Stevens v. Gwathmey, 9 Mo. 636; Norris v. Ins. Co., 131 Mass. 294; Smith v. Flanders, 129 Mass. 322; Hunters v. Burbank, 111 Mass. 213; Candee v. Skinner, 40 Conn. 464; Mustard v. Union Natl. Bank, 86 Me. 177. (4) Where most of the claims set forth in the petition are disallowed, the costs should be apportioned between the plaintiff and defendant. R. S. 1909, secs. 2264, 2265, 2266.

WILLIAMSON, J.—The plaintiff, the Universal Concrete Construction Company, sued the defendant, the City of St. Louis, in the sum of $212,088.96, as the balance claimed by plaintiff to be due it upon a contract for the building of the River Des Peres Foul Water Sewer. Defendant in its answer filed April 30, 1914, admitted liability in the sum of $70,407.73. Sundry payments were made by defendant thereafter and before judgment, and on December 6, 1916, judgment was rendered in favor of plaintiff in the sum of $22,152.40. Both parties have appealed from this judgment. Separate

appeals were taken, but they have been consolidated and will be decided as one.

We take from plaintiff's brief the following statement, which, with slight additions, will suffice for a perliminary statement of the facts.

"These are cross-appeals from the judgment of the Circuit Court, of City of St. Louis, in a reference case. . . . By agrement of parties, these cross-appeals are briefed as one case. . . .

"Pursuant to certain ordinances passed by the Municipal Assembly of the City of St. Louis, the city entered into a contract dated July 1, 1910, with the Universal Construction Company . . . for the construction of the River des Peres Foul Water Sewer, Second Section, a part of the public sewer system of the city. The contract was a former one containing various provisions and requiring the work to be done in accordance with certain plans and specifications and involved, roughly speaking, something in the neighborhood of half a million dollars. Payments to the contractor were provided for on monthly estimates of the engineer and on the completion of the work the balance due the contractor, except five per cent, was to be paid, the five per cent to be retained for one year as a guaranty of the work. The plaintiff entered upon the execution of the contract and completed the work in the fall of 1913, the sewer being accepted by the city on December 12, 1913. During the progress of the work divers controversies arose between the contractor and the city over estimates, classification of materials and other questions that came up, and when the work was completed the plaintiff presented to the sewer commissioner of the city, under whose supervision the work was done, a list of claims which were considered by him in connection with the preparation of his final estimate of the work. Some of these claims the commissioner allowed, some he rejected and as to others he made allowances in lieu thereof. The final estimate was completed by the sewer commissioner on February 12, 1914,

showing to be due the contractor at that time the sum of $98,716.59, of which $70,407.73 was then payable, and the balance of $28,308.86, being five per cent of the total amount accrued under the contract, was to be retained by the city for one year. The plaintiff refused to concur in this final estimate or to accept the amount shown thereby to be due and instituted this suit, making the Mercantile Trust Company a party plaintiff, because of an assignment executed by the Universal Construction Company, of the retained percentage held by the city under the contract.

"The petition sets out the facts in regard to the contract and the construction of the sewer, and then in paragraphs numbered 7 to 19, inclusive, specifies the facts and details of the claims and amounts which plaintiff alleges it is entitled to recover over and above what is shown to be due in the sewer commissioner's final estimate. Judgment is prayed for the total amount of these claims, together with interest and costs. The answer of the city admitted the contract and the execution of the work, denied the facts as to most of the claims, admitted the final estimate, pleaded the decision of the sewer commissioner as being final under the terms of the contract, and set up that the city could not pay plaintiff because a suit had been brought by certain materialmen of a sub-contractor who did work on the sewer seeking payment of their claims out of the moneys due plaintiff from the city for the sewer construction. The reply attacked the decision of the sewer commissioner as being arbitrary, mistaken, wrongful, and based upon erroneous, uncertain and insufficient data and misconstruction of the contract provisions.

"The case was referred to Hon. Edgar R. Rombauer, as referee, who heard the testimony, and in due course filed his report. The transcript of the testimony taken before the referee was voluminous, amounting to 1194 printed pages, and the referee in connection with his report made an abstract of the testimony which was filed

and printed in the court below. The referee passed on each of the claims set out in the petition, rejecting some, allowing others, and recommended a judgment in favor of the plaintiff for $146,145.62. This report was filed and shortly afterwards the case was re-referred to the referee to hear certain evidence bearing upon the question of interest, and payments on account, made by the city while the case was pending before the referee. This the referee did, and filed a supplemental report. Both parties filed exceptions to the report of the referee, and these coming on for hearing the court overruled all the exceptions of plaintiff, sustained divers exceptions of the defendant, and entered a judgment in favor of plaintiffs, which, in effect was the amount shown on the final estimate of the sewer commissioner with interest, plus an amount of $282 on one of the claims for lumber left in the trenches. Thereupon, motions for new trial by both parties were filed and overruled and these appeals per-fected to this court.

"On some of the claims set out in the petition and denied by the referee, the evidence was of such character that it might be held, not unreasonably, that plaintiff had failed to sustain the burden of proof. All such claims have been eliminated on this appeal, leaving the following as the ones in controversy here, viz.:

"1. Claim in paragraph 8 of the petition on account of classification of material. Allowed by the referee for $7,952.83. Plaintiff's exception for inadequacy over-ruled, and defendant's exceptions sustained and claim disallowed.

"2. Claim in paragraph 9 of the petition as to the amount of brick masonry in the sewer. Disallowed by the referee, and plaintiff's exception thereto overruled.

"3. Claim in paragraph 10 of the petition for foun-dation material. Allowed by the referee for $31,542.19. Defendant's exceptions sustained and the claim disal-lowed.

"4. Claim in paragraph 11 of the petition for extra masonry between certain points. Disallowed by the referee, and plaintiff's exception overruled.

"5. Claim in paragraph 15 of the petition, for pointing and striking masonry joints. Allowed by the referee for $309. Plaintiff's exception for inadequacy overruled, and defendant's exceptions sustained, and claim disallowed.

"6. Claim in paragraph 16 of the petition, for rebuilding a caved-in portion of the sewer. Allowed by the referee for $437.15. Defendant's exceptions sustained and claim disallowed.

"7. Claim in paragraph 18 of the petition for loss on account of below grade construction of a portion of the sewer. Disallowed by the referee and plaintiff's exception overruled."

Omitting formal parts, the judgment was as follows:

"The court doth therefore find that the defendant became indebted to the plaintiff, Universal Construction Company, on February 12, 1914, in the sum of $70,689.73, and that the defendant also became indebted to said plaintiff on December 12, 1914, in the further sum of $28,308.86, making a total indebtedness of $98,998.59, on account of the matters and things set out in said plaintiff's petition, and that said plaintiff is entitled to recover interest upon said sum of $70,689.73 from and after February 12, 1914, and also to recover interest on said sum of $28,308.86, from and after December 12, 1914. And the court doth further find that between the 12th day of February, 1914, and the 3rd day of June, 1916, interest accrued on the two sums mentioned above in favor of said plaintiff amounting to the sum of $6,965.98, after giving defendant proper credit for partial payments made between those two dates inclusive of the latter, and that the total indebtedness of defendant to said plaintiff, including interest, then amounted to the aggregate sum of $105,964.57, less said payments. The court does still further find that defend-

ant had paid on account of said indebtedness from time to time the total sum of $84,407.61, leaving a balance due on June 3, 1916, of $21,496.96, and that there has accrued upon said balance interest to this date amounting to $655.64, and the defendant is now indebted to said plaintiff, Universal Construction Company, in the sum of $22,152.60. And the court doth still further find that, under the pleadings and evidence, the plaintiff, Mercantile Trust Company, is not entitled to recover jointly with its co-plaintiff, the Universal Construction Company, any sum whatever in this cause.

"It is therefore ordered and adjudged by the court that the plaintiff, Universal Construction Company, have and recover of the defendant the said sum of $22,152.60, together with the costs of this suit, and that execution issue therefor; and it is further ordered and adjudged by the court that the petition be and is hereby dismissed as to the plaintiff Mercantile Trust Company."

Such further facts as may be deemed pertinent, may be found in the opinion proper.

We acknowledge our indebtedness to counsel for supplying us with a fair and clear statement of the facts in these cases. We particularly commend the frankness of counsel for the Construction Company in admitting that "the evidence was of such a character that it might be held, not unreasonably, that plaintiff had failed to sustain the burden of proof" with respect to certain of its claims. Such admirable candor does much to lighten the labors of the court and to expedite the administration of justice. Such conduct also inspires a belief that counsel are familiar with the law and the facts involved, and have a wholesome confidence in their ability properly to present the really important questions.

*Commissioner's Estimates.*

Preparatory to a discussion of some of the questions arising in these cases, it is well to quote an important paragraph in the contract upon which these suits are based. That paragraph is as follows:

"To prevent all disputes and litigation, it is further agreed by the parties hereto, that the sewer commissioner shall, in all cases, determine the amount or quantity, or the classification of the several kinds of work or material which are to be paid for under this agreement, and that he shall decide all questions which may arise relative to the execution of this agreement, and his estimates and decisions shall be final and conclusive."

The powers thus vested in the sewer commissioner are very broad. He is empowered to decide all questions as to the amount or quantity of work and material; to classify both; to decide all questions arising under the execution of the contract, and his decision is final. The contract is the law, as between the parties, and the commissioner is the judge. No appeal lies from his decision, in the absence of fraud, mistake, or such gross negligence or arbitrariness as would be tantamount to fraud. The avowed purpose of this provision is to prevent litigation. It is an agreement which the parties had a right to make. Inquiry into the commissioner's findings, then, is necessarily limited to two questions: first, does the contract empower the commissioner to decide the particular matter decided by him, and, second, was his decision free from fraud, arbitrariness and mistake? Elimination may be carried further, for there is no charge of actual fraud made against the commissioner and jurisdiction of the parties is conceded. If, then, we find that he had jurisdiction of the subject-matter and that his findings are neither arbitrary nor mistaken, his decision is final. By mistake, as here used, is meant not a mistake in judgment, but a mistake in the facts upon which the judgment is based. Plaintiff assails the findings of the sewer commissioner "as being arbitrary, mistaken, wrongful and based upon erroneous, uncertain and insufficient data and misconstruction of the contract's provisions."

I. Plaintiff's first proposition refers to the excavation of certain material designated in the record by some of the witnesses as "macadam material." The

sewer commissioner rejected plaintiff's claim as to this item.    The referee allowed plaintiff $7,952.83 upon it. Both parties excepted to this ruling. Plaintiff

*Macadam Material.* claimed that the amount allowed was not enough, and defendant claimed that nothing should have been allowed.    The trial court unheld the decision of the sewer commissioner. The plaintiff asserts that the dispute hinges upon the interpretation of the following clause in the contract:

"All excavations shall be measured in place and paid for by the cubic yard at the unit price as bid under the following heads, viz:    Class A and Class B.

"Class A shall include detached pieces of rock or boulders one cubic yard or more in content, all masses of solid, well defined ledges of stone, or masses of rock.

"Class B shall include all other materials encountered."

Plaintiff contends that this macadam material should be classified as Class A work, and defendant claims that it is Class B work.

It is, of course, obvious that this material does not fall within the description of "boulders one cubic yard or more in content," nor in that of "solid, well-defined ledges of stone," but plaintiff claims that it is properly described as "masses of rock" as that phrase is used in the contract, and should therefore be paid for as Class A material.

If this material does not constitute "masses of rock," then it is to be classified as Class B. excavation, for Class B includes all material not included in Class A.    Defendant contends that there are but two classes of material included within Class A, namely, boulders containing one cubic yard of content and "all masses of solid, well-defined ledges of stone," and that the following phrase "or masses of rock" is but an equivalent expression for "solid, well-defined ledges of stone," and further contends that the so-called macadam material was not a mass of rock as a matter of fact.    Much evidence, both *pro* and *con,* was heard on these propositions,

and that evidence was weighed and determined by the trial court. As fairly indicative of the character of this evidence, and of the conflicts to be found in it, we quote from the testimony of two of the many witnesses who testified concerning this material, as follows:

JOHN C. SOUTHGATE.

JOHN C. SOUTHGATE, Civil Engineer: "I saw material on the work consisting of various sized pieces of rock forming a compact mixture firmly cemented together. Noticed that material during the whole time at different places along the line. After I left the employ of the city I took a sub-contract under the contractor to build part of this sewer, sub-contract extending from Station 309 to 329 plus 50. This material appeared all along the sewer wherever there was solid rock, heavy rock. I would describe it as an old macadam roadbed made up of brown limestone rock, or rocks, all the way from the size of a pea to chunks as big as your fist, and that was wedged in with the larger boulders. It was a natural formation, had to be picked out, was very hard, the whole thing cemented; the smaller stuff was more compact; that is, cemented with a sticky soil more like gumbo soil; black clay, just enough to hold it together; I would say possibly 75 or 80 per cent of it was limestone; the rest this black soil. It was very compact; practically a solid mass. . . . This material was not in pockets. It was on top of the ledge rock; varied from six inches to three or four feet. In most cases, it was on rock. In one case I have in mind, it was just this stratum lying in the dirt."

Cross-Examination: "As engineer for the city I considered this material Class B excavation. I stated in my letter as engineer: 'This material runs as high as 80 per cent rock, and under my interpretation of the classification is Class B, and I have estimated it as such.' City classified and paid for it as Class B while I was a sub-contractor, and I went ahead with the work without any controversy."

BENJAMIN F. SCHABERG, Civil Engineer:. "Saw it. Held together by blue clay. Fifty per cent loose rock, 50 per cent clay. Usually encountered along beds of the stream, and in some cases where we went through it, it overlaid the rock. I kept record as record had been kept prior to my time. Material differed in consistency in some places looser than others. Variation perfectly natural. . . . A day or two after they got it out it would disintegrate. Handled some of it after taken from trench. Stuff gummy substance with pieces of rock in it. You could pull rock out of pieces of it you picked up, and occasionally out of the banks in the trench."

Cross-Examination: "Appeared to have been chips or spalls of limestone ranging in size from small marbles to two hands. Usually ran in flat slivers probably about size of your hand all mixed together with blue clay. In spots pretty compact, in other places not so much stone in it, considerable looser. Did not require near the excavation to take it out. It was closely akin to macadam. Compact masses of rock would give the general appearance of it."

Mr. Southgate was a witness for plaintiff; Mr. Schaberg, for the defendant.

The case itself was an action at law and was properly referred. The trial court was vested with power to adopt, modify or reject the findings of the referee. Upon appeal to this court, our power is limited merely to the inquiry as to whether or not there is substantial evidence to support the findings of the trial court. In such cases, we do not weigh conflicting evidence. [St. Louis v. Parker Washington Co., 271 Mo. 229, 1. c. 240.] The recent act of the General Assembly touching this situation (Laws 1919, p. 213) is not retroactive and does not apply in this instance. The judgment in the case at bar was rendered December 6, 1916. The Act of 1919 because effective long after the appeal in this case had been taken. We have recently decided that the Act of 1919 above men-

*Weighing Evidence.*

tioned, requiring this court to weigh the evidence in reference cases, does not apply to causes which were pending in this court on appeal when the Act of 1919 became effective. [Christine v. Luyties, 280 Mo. 406.] Plaintiff questions the correctness of the ruling in the Christine case, but after careful consideration of those criticisms, we are not inclined to modify the opinion which we there expressed. The record discloses abundant evidence to sustain the finding of the trial court upon this point, and, that being the case, we are powerless to interfere. We rule this contention against the plaintiff.

Our ruling upon the Reference Act of 1919 confines the remainder of this opinion practically to a determination of whether or not the judgment below is sustained by any substantial evidence.

II.   Plaintiff next contends that the sewer commissioner should have allowed $19,048.11 more than was allowed by him on the claim relating to brick masonry. On this point the referee sustained the decision of the sewer commissioner, and plaintiff's exceptions to the report of the referee on this point were overruled by the trial court. In the view which we take of this case, we do not need to discuss the legal principles argued by plaintiff touching this point.

Brick Masonry.

The contract provides that the brick masonry "shall be measured in place and paid for by the yard." The exact thickness of the walls is nowhere specifically named in the contract, but it is shown upon Plat 42, which is a part of the plans shown as a blue-print drawing, and which is made a part of the contract. The sewer commissioner adopted thirteen inches as the average thickness and made his estimate upon that basis. Plaintiff contends that the average thickness is in excess of thirteen inches, and that it is therefore entitled to recover $19,048.11 more than was allowed by the sewer commissioner on this item. Upon this point we quote and adopt as justified by the evidence, the finding of the referee, as follows:

"While the contract and specifications, exclusive of the plans, nowhere specify that the sewer shall be built with a certain thickness of walls, the specification being for three-ring brickwork only, certain blue print plans formed a part of the contract and specifications and by the contract were specifically made part threreof. Among these plans was one marked Sheet 42, containing a number of drawings showing the construction of various portions of the sewer, immediately at manholes, which sheet was marked 'Manholes for Brick Sewers.' This sheet shows the construction of the body of a seven-foot diameter three-ring brick sewer immediately at the manhole and shows the width of the brick masonry immediately at these points to be thirteen inches. Much evidence was introduced on behalf of the contractor tending to show that masonry construction at manholes is usually neater and therefore closer than it is in the body of the sewer at other points, and also tending to show that even immediately at the manholes this sheet does not show a thickness of thirteen inches for the wall consisting of three-rings of brick. On the other hand, much evidence was introduced by the city tending to show that the plan does show a width of wall of thirteen inches for three-ring brick work immediately at manholes and that the work at manholes is the same as at other portions of the sewer. I find that Sheet 42 does show the width of three-ring brick masonry immediately at manholes to be thirteen inches, and when this sheet is read in connection with that portion of the contract (page 4) reading: 'Sheet 42 shows the seven-foot and six-foot circular brick sewers which shall be furnished and placed between Station 70 plus 00 and Station 329 plus 50, as itemized under "work to be done," ' shows conclusively that the parties to the contract, in legal effect, contemplated that under the specifications and plans the brick masonry placed by the contractor was to be measured in place by applying the factor of thirteen inches as the average width of the three-ring brick wall in place. . . .

"I find as a fact in connection with the question of allowance for brick masonry that the average thickness of the walls of the sewer on three-ring brick work was not exceeding thirteen inches except that portion of the walls comprising the arch, from spring line to spring line, and as to that portion of the arch I find that the average thickness of the walls on three-ring brick work, including therein the coating of mortar not less than 3/8 inches thick, with which that part of the brick masonry of the sewer was specified to be coated, was thirteen and three-eights inches in thickness."

The trial court upheld the finding of the referee, as upon the facts it was justified in doing. Furthermore, plaintiff's evidence on this point is far from satisfactory. In making this estimate, plaintiff's engineer *assumed* the vitrified brick to be four and one-half inches wide, apparently because that was the maximum width allowed by the contract. But the contract also allowed vitrified brick to be of a minimum width of four inches. In making his estimate of the quantity of common brick, he seems also to have assumed that the sewer wall was fourteen inches thick. Various other witnesses who testified for plaintiff on this point show that they took records of measurements, but they did not produce them. Their testimony abounds in vague expressions and does not carry conviction. We have searched this dreary record with care on this question and, as a result, we are persuaded that the finding of the trial court that the sewer wall was, on a fair average, thirteen inches thick, was sustained by substantial evidence. For the reasons stated in paragraph one, that finding we regard as conclusive on appeal.

III. Plaintiff's third item relates to foundation material, called "dry-mix" in this record. It appears that throughout a large portion of the ditch in which

**Dry Mix Foundation.** this sewer was built, more or less water was encountered. In other places the sewer-ditch ran through solid rock or dry earth. For

various reasons, it is apparently difficult to dig a ditch so accurately as to always be able to lay the bottom of the sewer directly upon the bottom of the ditch. It was anticipated that at times it would be necessary to lay a foundation before the bricks were laid. The contract provided that this foundation should be of "Class C" concrete, that is, a compound of sand, cement and gravel in fixed proportions. The contract also contained these further provisions:

"These sewers shall be built upon the soil directly or upon "C" concrete foundation according to direction by the sewer commissioner.

"Concrete of the class specified shall be used in such forms and dimensions as are shown on the plans or described in these specifications and in such places as the sewer commissioner may direct.

"Concrete shall be estimated in place and paid for by the cubic yard. Only the amount called for on the plans, mentioned in these specifications, and that which the sewer commissioner directed to be put in place, shall be estimated."

Plaintiff claims, however, that, particularly when the ditch bottom was very wet, better results could be obtained by filling up to the required level with a dry mixture of sand and cement, instead of "Class C" concrete. This constituted the so-called "dry-mix." Plaintiff further contends that this was an item of extra expense not covered by the contract, for which defendant should pay. For this item plaintiff claimed $49,500.96 in its petition. The referee allowed $42,186.08 on this item, but the trial court allowed nothing. The sewer commissioner had already allowed plaintiff for "Class C" concrete work, the sum of $12,968.46. Defendant contends that this covers the item here in question. It also contends that the "dry-mix" was not a substitute for the "Class C" concrete required by the contract, but was merely a use of dry mortar in a wet ditch instead of wet mortar, at no increased cost, and done for the con-

venience of plaintiff. Hence, defendant insists, plaintiff is entitled to nothing on this item.

Again we are limited to the inquiry as to whether or not there was any substantial evidence in support of the action of the trial court in rejecting this claim in its entirety. Much evidence was heard on both sides of this question, but for the purposes of this inquiry we are concerned only with the evidence introduced by the defendant. It would be a weary labor to set forth all of the testimony of defendant's witnesses on this point, but a fairly accurate idea of it may be gained from the following quotations from the testimony of two or them.

· JOHN BLACK, City Inspector: "Saw dry mortar used on job, same as wet mortar, with a trowel. Possibly used a second ring of brick on flow line for five or six courses. Where it was wet. Very seldom used on vitrified brick; possibly once in every three or four days. . . . The dry mortar was sent down in buckets and poured on the side of the ditch and the bricklayers would take a trowel and scrape down; lay it the same as wet mortar. It was put between the bricks. Dry mortar not under bricks more than wet mortar to any extent. Perhaps where there was a small hole where dug too deep, it may have been about 1½ inches in places. Did not use dry mortar in wet places up to spring line. . . . If excavation properly made no necessity for filling. Sometimes they would put a piece of brick in and sometimes sand. . . . In my opinion no more mortar was used from spring line to spring line where using dry stuff than where using wet mortar. As far as I recollect, ditch was dug in such a way that trench was right width to fit sewer."

On Cross-Examination: "They did not get dry mix and spread it along the bottom and spread the brick on it. We laid a bed of brick and mortar as we went along. Would not swear to measurement of dry cement. It ought to be from 1/2 to 3/8ths of an inch; that is a collar joint. . . . Spaces between completed wall and ex-

cavation well filled in. Sometimes poured sand in there. No dry mix except such as may have been left in bottom. We may have used a bucket that was left over from the bottom. Spaces would not most of the time be filled in solid. Filled with pieces of brick and loose mortar in bottom.''

ERNEST PAFFRATH, Civil Engineer: ''Saw them use dry mix in wet bottoms. Same as they used wet mortar. Would let down dry mix in buckets and dump it on side, where bricklayer could best get at it, and he would use that the same as he would wet mortar, by taking the bricks and incorporating the stuff between the bricks, so as to form the joints. Sometimes he would take a brick and if the stuff was lying here put his brick in it, bring it up and shove the brick up, so that it would form the head joint of the side joint. Sometimes he would take a brick without the trowel and gather up a certain amount of mortar that was lying in there. Did not use this dry mortar between the quarters and the spring line. Used it in sub-grade of sewer, bottom of excavation. . . . Saw them working on dry bottoms with wet mortar, same as with dry mortar. In dry bottoms, where variation in excavation gathered up chipped brick and mortar lying in bottom and probably put sand in some places. Wet bottoms same. Never told them to use dry mortar.''

On Cross-Examination: ''Stood at top of ditch, 18 to 28 feet deep, and saw bricklayers using dry mix in bottom. . . . In wet bottoms used dry cement to form joints in first ring of sewer. Dry mortar was not used in wet bottoms as foundation. Dry mix was not dumped all along the bottom, only where the bricklayer was at work. He would use it the same as mortar. Sometimes I would stand five minutes and sometimes fifteen minutes and watch them laying brick. Dry mix used from nothing to probably a half-inch.''

There was abundant evidence to support the finding of the trial court, and that ends the matter here.

IV. Plaintiff's counsel in their brief state the fourth item of plaintiff's claim as follows:

"Between Stations 82 and 88 the sewer was built in a tunnel through ground that was of such character that it would not support itself, but fell down upon the sewer walls, and in order to strengthen the masonry to **Sewer Support.** enable it to resist the pressure thus brought upon the sewer the plaintiff put in 162.50 Cubic yards of extra brick masonry over the arch of the sewer for its protection. Plaintiff claims compensation for this extra brick masonry at the rate of $8.50 per cubic yard, the contract price. The referee, in his report, disallowed the claim on the ground that the findings of the commissioner as to the amount of brick masonry were conclusive. Plaintiff's exceptions to this recommendation of the referee was overruled by the court."

Defendant contends that this item was allowed in the final estimate of the sewer commissioner, and for that reason it was not allowed again by the referee when presented as a separate item. If this item was once allowed in the gross sum allowed by the sewer commissioner, it, of course, ought not to have been again allowed as a separate item by the referee, for he confirmed the finding in gross of the sewer commissioner on this class of work. Be this as it may, however, this item is clearly one of the matters which, by their contract, the parties confided to the decision of the sewer commissioner, and concerning which they agreed that his decision should be final. The sewer commissioner either allowed this amount in his final estimate in a lump sum, with other similar work, or he rejected it. In either event, he decided this question and that precludes further inquiry. The trial court refused to allow this item, and we concur in his ruling.

V. Plaintiff presents also a claim for "jointing and striking," in the sum of $7,445.79. In the interest of clarity, it should be said that this item relates to filling in mortar between joints in the brick wall, so as

to bring the surface of the mortar even with the surface
of the brick, and thus fill any holes which may
Jointing. have been left. Plaintiff thinks that this work
is not covered by the contract and that, though required
by the city, it had an artistic rather than a practical
value. Defendant, on the other hand, claims that it never
ordered this work to be done; that the claim was pre-
sented to the sewer commissioner and not allowed by
him; that plaintiff's testimony relating thereto is so
vague, divergent and contradictory as to be of no evi-
dential value, and that, in any event, this item falls
within the scope of the following paragraph of the con-
tract: "Any work not herein specified which may fairly
be implied, as included in the agreement, of which the
sewer commissioner shall be the judge, shall be done by
the contractor without extra charge."

The sewer commissioner made no allowance to plain-
tiff on this item. The referee concluded that plaintiff
should recover $309 on this claim, but the trial court
refused to allow anything. There was evidence tending
to show that such work as was done in pointing up the
walls was such as is incident to any ordinary job of
brick-work, and that it was therefore governed by the
contract provision last above quoted. Plaintiff's evi-
dence, furthermore, was of such an unsatisfactory
character that the trial court may well have felt justified
in attaching but slight importance to it. For example,
one of plaintiff's witnesses testified that this work was
worth twenty-five cents per lineal foot, and another tes-
tified that it was worth about one dollar per lineal foot.
Other vagaries might also be pointed out. We have
scanned the evidence on this point with some degree of
care, and we are not disposed to disturb the action of the
trial court on this item.

VI. The next item of plaintiff's claim relates to the
rebuilding of a portion of the sewer which caved in.
Plaintiff thus states the material facts of this claim.

"After the plaintiff had built a portion of the sewer according to the plans and specifications, a part of it between Stations 300 plus 94 and 301 plus 36 caved in, because, on account of the character of the ground, an undue pressure was exerted against the sides of the sewer. Plaintiff cleaned out this caved-in portion and rebuilt it, and under the direction of the city's representatives reinforced the rebuilt portion with concrete. The additional expense entailed was $437.15, and the referee in his report recommended the allowance of the claim, but the court sustained defendant's exceptions thereto and disallowed it."

Rebuilding of Caved Portion.

Plaintiff claims that the caving-in of this portion of the sewer was due to defects inherent in the plan of construction adopted by the city, while the city claims that it was due, in part, to a too-hasty removal of the sheeting which was designed to hold back the walls of the ditch until mortar in the sewer-walls had set, and in part to the use of frosty bricks in damp weather. There was substantial evidence in support of both contentions.

Concerning this item, the referee said, in part: "I find as to this claim that the city is in no way responsible for the caving-in of the trench at this particular point. The mere fact, therefore, that the commissioner allowed on account of this cave-in the sum of $500, does not entitle the contractor to further compensation in this respect, regardless of the amount of work that he may have been called upon to do by reason of the cave-in. The commissioner would have acted strictly within his right if he had not made any allowance to the contractor upon this claim. The finding on this claim, therefore, is in favor of the city and against the contractor, and judgment should be entered accordingly."

The finding of the trial court, which was in favor of defendant, is conclusive. We rule this point against the plaintiff.

VII. The final claim presented here by plaintiff is for $20,951.30. This claim is stated by plaintiff's counsel as follows:

"Between Stations 123 plus 62 and 144 plus 62 and also between Stations 283 and 309, the engineers of defendant gave plaintiff a grade for the construction of the sewer which was below the grade shown upon the sewer profile. A large additional expense and loss was caused to plaintiff thereby, for which compensation is sought in this claim. . . . The sewer here was about

**Extra Depth.** 27 feet below the surface and the bottom was in quicksand protected above by a hard material. The result of requiring the contractor to go below the established grade was to dig into this quicksand which ran into the ditch, undermining the hard material above, and causing a cave-in of the sewer trench. . . . The cost of ordinary excavation fixed by the contract was $1.25 per cubic yard, but on account of the character of the material and the depth at which the sewer ran at this particular point, it was worth a great deal more to take out the material from the bottom of that trench than the price fixed by the contract for the average excavation. The reasonable value of taking out the material from the bottom of that cut, according to Mr. Richards, superintendent, was five or six dollars per cubic yard. Moreover, the trouble on account of cave-in and keeping out quicksand and water was enormous and entailed a heavy loss on the contractor."

The contract contains the following paragraph: "The sewer commissioner shall have the right to make alterations in the line or grade of the work herein contemplated, or any part thereof, either before or after the commencement of the work."

The defendant insists that whether the change of grade was intentional or by mistake, the plaintiff was paid for the excavation in any event, since the total excavation cost was allowed in the sewer commissioner's report; that the sewer commissioner's decision, which

was adverse to plaintiff on this point, was final, and that plaintiff, therefore, has no right to complain. The referee disposed of a portion of this claim as follows:

"It is self-evident that it could not have cost the contractor much, if anything, more to remove an additional amount of material varying in dept from nothing to .67 of a foot in a distance of 1,100 feet than it would cost the contractor to move earth lying immediately on top of the earth in question. The fair way to have fixed the price for this additional excavation would have been to add the additional quantities to the total quantities excavated and to have applied to that total quantity a fair average price for the entire excavation, in the event that such fair average price would under the circumstances have exceeded the average price fixed in the contract, and then have taken the average price so fixed and multiplied the excess yardage removed by the price so fixed and added the result obtained in this manner to the quantities of excavation provided for under the plans and profiles. It is very doubtful in my mind whether if this process had been followed the contractor would have been entitled to an allowance in addition to the allowance actually made in the final estimate. In any event there is no evidence from which a fair average price can be reached and therefore no reason exists why the price fixed by the engineer should be overturned."

As to the remainder of this item, the referee was of the opinion that the plaintiff had "failed to make out the allegations of his petition," and he therefore recommended that this claim be denied. The trial court took a similar view and, in conformity with the decision of the sewer commissioner, refused to allow the claim. We have read the briefs of counsel as well as the evidence upon this point, with care, and we see no reason to disturb the finding in which the sewer commissioner, the referee and the trial court concurred. This claim was properly denied.

VIII.   Defendant complains of the action of the trial court in allowing plaintiff the sum of $282, for lumber left by it in a tunnel under certain railroad tracks, beneath which the sewer was built.   This claim was allowed by the referee, and his finding was confirmed by the trial court as above stated.   It appears that this lumber was placed above the sewer in the tunnel under the railroad tracks in order to keep the roof of the tunnel from falling in.   No provision of the contract relates to this item.

**Lumber.**

The referee found as a fact that this lumber was left, if not at the express direction of the city, at least upon its intimation and suggestion.   This point is but lightly touched in defendant's brief and is not discussed at all in the brief for plaintiff.   Such evidence as we have been able to find in a voluminous and imperfectly indexed record, bearing upon this question, tends to support the action of the referee and of the learned trial court.   As the matter is here presented, we would not feel justified in going counter to the action of the court below.   We rule this point against the defendant.

IX.   Interest was allowed upon various portions of the aggregate judgment in this case from various dates. The particulars appear in the excerpt from the judgment. which has been quoted above.   The defendant complains of this ruling.   It appears that during the pendency of this suit in the trial court, another and independent suit was brought against plaintiff and defendant by the Hunkins-Willis Lime & Cement Company.   The purpose of this latter suit was, in part, to enjoin the city from paying to plaintiff certain sums, if it were determined that the plaintiff was entitled to recover at all.   The Cement Company and various others (who presently intervened in that action) were asserting claims against the plaintiff herein.   No temporary restraining order or injunction was issued against the city, however, and no reason appears why it could not have paid the amounts in its hands which were admittedly due

**Interest.**

the Construction Company (plaintiff herein) into court, and thus, to that extent, have eliminated the question of interest. It elected not to do so. Under these circumstances, we think the allowance of interest as fixed by the court below was well enough.

X. The defendant also complains of the action of the trial court in taxing all of the costs of this case against it. In the court below defendant filed a motion to have the costs taxed against plaintiff and defendant Costs. in the proportion that the amount sought to be recovered against defendant bore to the amount actually recovered. This motion was overruled and by proper steps is before us for review. The plaintiff prayed judgment in the total sum of $212,088.96. This total is made up of the amount shown by the estimate of the sewer commissioner to be due plaintiff, aggregating, including a portion which was to be temporarily withheld, approximately $99,000. The remainder of the $212.088, for which plaintiff prayed judgment is made up of the various claims above discussed and others which are not urged here. Although the answer included a general denial, the defendant at the hearing and in its briefs here conceded liability in the sum of $99,000, in round numbers. The volume of proof before us, amounting to some twelve hundred pages, and the bulk of the costs incurred, relate to these disputed claims and grow out of their determination.

These claims are thirteen in number, and plaintiff recovered judgment below on but one of them. The amount of that judgment was $282. It is obvious that the costs must amount to several thousand dollars. Some of the claims asserted by plaintiff in the trial court were frankly abandoned by it on appeal. All, save one, of the remainder, have been adjudged against it. Some of these claims rest upon very slight foundation, and many of them impress us as being exorbitant in amount. We recognize the fact that the trial court has a wide discretion in taxing costs, but it would seem that if the power

given by the statute is ever to be exercised, the instant case presents a fit opportunity. We think the learned trial court erred in overruling defendant's motion in relation to this matter.

In view of the size of the record before us, and of the nature of the issues involved, we think that it is the duty of the trial court properly to apportion the costs here involved. This case is governed by Section 2266, Revised Statutes 1909, and the trial court, bearing that statute in mind, should have little difficulty in apportioning these costs with approximate accuracy. That is all that the statute contemplates, for, from the nature of the case, mathematical accuracy is impossible.

The net result, in our opinion, is that in all matters, except as to the costs, the judgment should be affirmed, but, for the error in the ruling of the court below upon defendant's motion to apportion the costs, the judgment, as to that matter alone, should be reversed and the cause should be remanded with directions to the trial court to apportion the costs in conformity with the views herein expressed.

It is so ordered. All concur.